# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

FAZL MUGHNI,

      Plaintiff

      vs

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

Case No. 1:11-cv-18

Spiegel, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for supplemental security income (SSI). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 12), the Commissioner's Memorandum in Opposition (Doc. 18), and plaintiff's

reply. (Doc. 19).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1955. Plaintiff has a high school education and he attended two

years of college. (Tr. 182). Plaintiff has past relevant work experience as a temporary laborer,

ballpark vendor and a cargo handler. (Tr. 21, 178). Plaintiff filed his current SSI application on

February 11, 2008, alleging disability since October 7, 2004, due to a brain tumor, herniated

disc, rotator cuff tear and stroke.[1] (Tr. 139-41, 177). Plaintiff's application was denied initially

and upon reconsideration. Plaintiff then requested and was granted a de novo hearing before an

administrative law judge (ALJ). On March 31, 2010, plaintiff, represented by counsel, appeared

---

[1]Plaintiff previously applied for disability benefits in 1975, 1989, 1991, 1992, 1993, 1997, 2002, and 2006.
(Tr. 69, 142-43).

and testified at a hearing before ALJ Robert Flynn. (Tr. 31-57). A vocational expert (VE), Mark Pinti, also appeared and testified. (Tr. 57-62).

On May 10, 2010, the ALJ issued a decision denying plaintiff's SSI application. (Tr. 12-23). The ALJ determined that plaintiff suffers from the following severe impairments:

> multi-level degenerative disc disease, status-post a left fibula fracture, status-post a cerebrovascular accident (CVA), hypertension, a benign brain tumor, headaches, Hepatitis C, carpal tunnel syndrome, status-post a pars plana vitrectomy and lensectomy in the right eye, a history of right foot pain, a history of glaucoma, a history of chronic bronchitis/chronic obstructive pulmonary disease (COPD), a history of syncopal episodes, depression, a psychotic disorder, and a personality disorder.

(Tr. 15). The ALJ next determined that plaintiff does not have an impairment or combination of impairments that meets or equals the requirements of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17). The ALJ found that plaintiff retains the following residual functional capacity (RFC) to perform a range of medium work:

> [Plaintiff] can lift up to 50 pounds occasionally and can lift or carry 25 pounds frequently. He can stand/walk for a total of six hours in an eight-hour workday with normal breaks. He can sit for a total of six hours in an eight-hour workday with normal breaks. He is unable to climb ladders, ropes, or scaffolds, but can climb ramps and stairs frequently. He can balance, stoop, crouch, kneel, and crawl frequently. He can handle objects with the left hand frequently. He can finger items frequently with the left hand. He can feel frequently with the left hand. He should avoid concentrated exposure to extreme cold, poorly ventilated areas, and irritants such as fumes, odors, dust, chemicals, and gases. He should avoid all exposure to unprotected heights and the use of moving machinery. Any job he could perform should not require fine visual acuity in the right eye. Any job he could perform should involve work limited to simple, routine, and repetitive tasks in a low-stress environment, which is defined as free of fast-paced production requirements, involves only simple work-related decisions, has few, if any, work place changes, no contact with the public, and only occasional contact with coworkers and supervisors, and involve no tandem tasks.

(Tr. 18). The ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, plaintiff's statements

2

concerning the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with his RFC. (Tr. 19). Based on the VE's testimony, the ALJ determined that jobs exist in significant numbers in the national economy that plaintiff could perform given his age, education, work experience, and RFC. (Tr. 22). Consequently, the ALJ concluded that plaintiff is not disabled under the Social Security Act and therefore not entitled to SSI. (Tr. 23).

Plaintiff's request for review by the Appeals Council was denied (Tr. 1-3) making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental

3

impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes him from performing the work he previously performed or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations which is the same for purposes of both DIB and SSI benefits. *See* 20 C.F.R. §§ 404.1520, 416.920; *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Sec'y of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Sec'y of H.H.S.*, 667 F.2d 524 (6th Cir. 1981).

4

The Commissioner is required to consider the individual's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If the individual suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of the individual's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk,* 667 F.2d at 528.

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Sec'y of H.H.S.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Sec'y of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Sec'y of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Sec'y of H.H.S.*, 820 F.2d 768, 771 (6th Cir. 1987).

5

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson*, 735 F.2d at 964 (emphasis in original); *O'Banner*, 587 F.2d at 323. Taking notice of job availability and requirements is disfavored. *Kirk*, 667 F.2d at 536-37 n.7, 540 n.9. There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips* v. *Harris*, 488 F. Supp. 1161 (W.D. Va. 1980) (citing *Taylor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born*, 923 F.2d at 1174; *Varley* v. *Sec'y of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

A mental impairment may constitute a disability within the meaning of the Act. *See 42* U.S.C. §§ 423(d)(l)(A); 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three for an adult. 20 C.F.R. § 416.920a. The special procedure also applies when Part A of the Listing is used for an individual under age 18. *Id.* At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Rabbers* v. *Comm'r Soc.*

6

*Sec. Admin.,* 582 F.3d 647,653 (6th Cir. 2009) (citing 20 C.F.R. § 416.920a(b)(l)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R. § 416.920a(c)(3)).

The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.; *Craft* v. *Astrue,* 539 F.3d 668, 674 (7th Cir. 2008)). The degree of limitation in the first three functional areas is rated using the following five-point scale: None, mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 416.920a(c)(4)). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* (citing § 416.920a(d)(1)). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *Id.* (citing § 416.920a(d)(2)).

At step three of the sequential evaluation, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." *Id.* A claimant whose impairment meets the requirements of the Listing will be deemed conclusively disabled. *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. § 416.920a(d)(3)).

7

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk,* 667 F.2d at 538. In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Sec'y of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Sec'y of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters* v. *Comm'r of Soc. Sec.*, 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion

of a nonexamining medical advisor. *Shelman* v. *Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 416.927(d)(2); *see also Blakley* v. *Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker* v. *Shalala,* 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 416.927(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(d)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source,

how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(d)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 416.927(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 416.927(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(d)(5).

## MEDICAL RECORD

Plaintiff was initially evaluated by a social worker at Center Point Health Clinic (Center Point) on January 18, 2006. (Tr. 386). The social worker noted that plaintiff was a poor historian and rambled quite a bit. *Id.* Plaintiff was noted as having some paranoid ideation and exhibiting a flat affect. (Tr. 387-88). Plaintiff reported being extremely depressed and a history of substance abuse, including crack, marijuana, and alcohol. (Tr. 387). Plaintiff stated that he had been sober for approximately two to three weeks. *Id.* The case worker opined that plaintiff had a psychotic disorder, NOS, polysubstance dependence, and an antisocial personality disorder and assigned him a Global Assessment of Functioning (GAF)[2] score of 55. *Id.* It was

---

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with scores of 51 to 60 as having "moderate" symptoms. *Id.*

recommended that plaintiff would benefits from services to address his mental illness and substance abuse issues, including a case manager, psychological evaluation, and therapy. *Id.*

In July 2006, plaintiff presented to the emergency room at the University Hospital with complaints of dizziness and headache. He reported drinking "occasional alcohol." Plaintiff had full strength in his extremities, and a full range of motion in all extremities. His EKG was normal. Plaintiff was given intravenous fluids and discharged. (Tr. 271-77).

Due to complaints of left arm numbness, an MRI of plaintiff's brain was taken on October 11, 2006. The MRI demonstrated that plaintiff had an area of ecephalomalacia and gliosis in the right inferior frontal lobe related to a prior insult. Further results were consistent with a subacute stroke that had likely occurred within the past seven to ten days. (Tr. 278-79).

In February 2007, a second MRI of plaintiff's brain was taken due to complaints of blurred vision, headaches, and a history of head trauma. The findings were consistent with a subacute infarct in the right parietal lobe. (Tr. 282-83).

Plaintiff presented to the emergency room at University Hospital on February 17, 2008, with a swollen eye and mouth pain after being punched in the face. His visual acuity was good, even though his pupil did not dilate with light, and he was able to read fine print with glasses. Also, plaintiff was reported as having a full range of motion in all extremities with full muscle strength. Plaintiff was diagnosed with traumatic mydriasis of his right eye and was to follow up in the eye clinic the following day. (Tr. 294-96).

On March 4, 2008, plaintiff presented to the emergency room with complaints of left shoulder pain after falling off his bicycle because it was dark. (Tr. 297). He reported drinking

alcohol occasionally and using marijuana. (Tr. 303). Examination showed "slight tenderness as well as pain with range of motion although he was able range his motion fully." (Tr. 304). An x-ray showed some calcification about the level of coricoid and acromion processes but there were no acute findings or signs of acute fracture. *Id.* Plaintiff was diagnosed with acute left shoulder pain, given Tylenol #3, and discharged. *Id.* A magnetic resonance angiogram ("MRA") of plaintiff's head and neck taken on March 25, 2008, was normal. (Tr. 299-301).

In an undated letter, plaintiff's treating psychiatrist, Jonathan Rosenthal, M.D.,[3] of CORE reported that plaintiff has been under his care since June 28, 2006. Dr. Rosenthal reported that plaintiff has a history of poly-substance abuse and an intracranial mass and, as a result, he suffers severe headaches and blackouts. Dr. Rosenthal noted that plaintiff took Dilantin to prevent seizures. Dr. Rosenthal concluded that due to these conditions plaintiff was "incapable of gainful employment for the foreseeable future." (Tr. 261).

On May 2, 2008, plaintiff was treated at University Hospital at the Orthopaedic Outpatient Center for follow-up of a left distal fibula fracture. Plaintiff reported that his injury was the result of a fall. Plaintiff acknowledged that he had visited several emergency departments in the area in order to have his narcotic medication prescriptions filled. (Tr. 366).

On May 19, 2008, Nicole Leisgang, Psy.D., a consultative examining psychologist, conducted a psychological evaluation of plaintiff. (Tr. 316-22). Dr. Leisgang noted plaintiff's history of homelessness, drug and alcohol abuse, and long criminal history including drug

---

[3] Plaintiff, in his reply brief, mistakenly identifies Dr. Jonathan Rosenthal as Dr. Motiel Teresa Rosenthal. *See* (Doc. 19, p. 3). In fact, Dr. Motiel Teresa Rosenthal was plaintiff's attending physician on October 17, 2006, when plaintiff went to Mercy Hospital for complaints of arm pain. (Tr. 263)

trafficking, drug possession, concealed weapon, and felonious assault offenses. Dr. Leisgang noted that plaintiff had an appropriate affect, normal conversation, and no loose associations or flight of ideas. Dr. Leisgang noted that plaintiff did not appear to be psychotic during the evaluation; however, she referenced grandiose statements made by plaintiff in 2006, such as claims that he has a "relative who is an executive with Proctor and Gamble" and that "he was sexually abused as a child by a female federal judge." Dr. Leisgang noted that plaintiff did not deny his beliefs about these prior statements. Plaintiff reported that he had not used any illicit substances for the past 19 months. Dr. Leisgang diagnosed plaintiff with an unspecified mood disorder, polysubstance abuse in sustained full remission, and an unspecified personality disorder. She assigned plaintiff a GAF score of 50. Dr. Leisgang opined that plaintiff's ability to relate to others, including fellow workers, is moderately impaired, as he reported having no friends or contact with his family; his ability to understand, remember and follow simple instruction is mildly impaired; his ability to maintain attention, concentration, persistence and pace is moderately impaired. (Tr. 317-22).

In June of 2011, Vicki Casterline, Ph.D., a state agency reviewing psychologist, completed a mental RFC assessment of plaintiff. Dr. Casterline relied on Dr. Leisgang's evaluation and report and largely adopted her findings. Dr. Casterline opined that plaintiff had mild limitations on activities of daily living; moderate limitations on social functioning; and moderate limitations in concentration, persistence or pace. Further, Dr. Casterline noted that the medical record did not establish the presence of the C criteria for purposes of the Listings as plaintiff had no episodes of decompensation. Dr. Casterline concluded that plaintiff was able to

13

comprehend, remember and carry out simple task instructions, though he would have difficulty with detailed and multiple step tasks due to reduced stress tolerance and depressive symptoms. Further, Dr. Casterline opined that plaintiff could maintain attention on simple tasks and make simple decisions, adapt to a setting with routine and predictable duties, and would perform optimally in an environment with minimal interaction with others, although he could relate on a superficial basis for short periods of time. (Tr. 323-40).

On June 20, 2008, plaintiff was seen at Queen City Physicians by Prudence Tante-Takougang, M.D., for complaints of hypertension. Plaintiff exhibited normal neurological findings, including grossly normal strength in the upper and lower extremities, and was able to move all extremities without difficulty. Dr. Tante-Takougang diagnosed plaintiff with benign essential hypertension and cerebrovascular disease.[4] Plaintiff was put on a medication regimen to address his hypertension and advised to follow up in two weeks. (Tr. 373-76).

On July 9, 2008, Ronald Cantor, M.D., a reviewing state agency physician, completed a physical RFC form and opined that plaintiff was capable of a range of medium work, but should avoid concentrated exposure to poorly ventilated areas, fumes, odors, dust, and gases, and hazards such as heights and machinery. (Tr. 341-48).

In August 2008, plaintiff's Individual Service Plan was updated at Center Point. His diagnoses remained as an unspecified psychotic disorder and polysubstance dependence, and his GAF score was 50. Plaintiff reported that he been sober for at least three years. His case

---

[4] Plaintiff mischaracterizes the medical evidence by stating that Dr. Tante-Takougang "diagnosed [him] with a benign brain tumor on June 20, 2008." (Doc. 19, p. 3). Rather, the reference to a brain tumor merely reflected plaintiff's self-reported medical history. *See* Tr. 373. The only diagnoses made by Dr. Tante-Takougang were hypertension and cerebrovascular disease.

14

manager noted that plaintiff was able to handle his legal issues on his own and noted that he had family and friends with whom he communicated. (Tr. 382-85).

The record further includes a February 16, 2009 letter from Steven Wunder, M.D., to plaintiff's attorney.[5] The letter appears to be a compilation of Dr. Wunder's notes pursuant to an examination of plaintiff and a review of certain medical records. The letter references plaintiff's subjective complaints of pain and examination findings demonstrating reduced range of motion, but also notes that plaintiff failed validation criteria with manual muscle testing. Dr. Wunder indicated that the data base was inadequate and that plaintiff's reports of an intracranial tumor were not supported by any records. Dr. Wunder concluded that plaintiff could not "sustain remunerative employment." (Tr. 395-99).

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that he cannot work due to his brain tumor, vision, numbness in his left hand, pain in his shoulders, and a herniated disk in his neck. (Tr. 37-39). He testified that his last job was unloading mail for DHL, but his employment ended when the company lost a contract. (Tr. 37). Plaintiff testified that he walks approximately five miles a day. (Tr. 43). Plaintiff does not drive and has never had a permanent license. (Tr. 35). Plaintiff testified that he broke his ankle in 2007 while riding his bike after experiencing a black out. (Tr. 43, 47). Plaintiff further testified that he does volunteer work at a homeless shelter. (Tr. 37). He testified that the heaviest thing he had lifted since 2004 was a two liter

---

[5] The first page of this letter is missing from the record.

15

bottle of soda or carton of juice. (Tr. 44). Plaintiff also stated that he has had difficulty reading since 2007. (Tr. 35-36)

As to his daily activities, plaintiff testified that he cooks, dust mops, and washes dishes. (Tr. 51). Plaintiff stated that he takes out the trash, but that a friend recently mopped his floor. (Tr. 51-52). He made and sometimes sold paper roses and had played chess a few weeks earlier. (Tr. 53-54). Plaintiff testified that he does not do laundry, but throws away worn clothes and wears different clothes. (Tr. 51-52). Plaintiff further testified that he does not watch TV, but listens to the radio. (Tr. 53). Plaintiff stated that he does not see his children or grandchildren often because they have their own lives. (Tr. 50). Plaintiff testified that he takes his medication as prescribed, but had not taken them before the hearing because they make him drowsy. (Tr. 42).

Plaintiff stated that he stopped smoking tobacco approximately 10 years ago, stopped drinking alcohol approximately 10 years ago, and stopped using illicit drugs in November 1999. (Tr. 55).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked the VE to assume an individual who was able to lift up to 50 pounds occasionally, and lift or carry up to 25 pounds frequently, and further limited to standing/walking for a total of six hours in an eight-hour workday with normal breaks. He can sit for a total of six hours in an eight-hour workday with normal breaks. The individual may never climb ladders, ropes, or scaffolds, but can climb ramps and stairs frequently. He can balance, stoop, crouch, kneel, and crawl frequently. He is limited to frequent handling and fingering objects with the left

16

hand. The hypothetical individual should avoid concentrated exposure to extreme cold, poorly ventilated areas, and irritants such as fumes, odors, dust, chemicals, and gases. He should avoid all exposure to unprotected heights and the use of moving machinery. From a mental standpoint, the hypothetical individual could perform work that is limited to simple, routine, and repetitive tasks in a low-stress environment, which is defined as free of fast-paced production requirements, involves only simple work-related decisions, has few, if any, work place changes, no contact with the public, only occasional contact with coworkers and supervisors, and involves no tandem tasks. (Tr. 58).

The VE responded that such an individual would be precluded from performing plaintiff's past work as a ballpark vendor and cargo handler. (Tr. 58-59). The VE testified that such an individual, of plaintiff's age, education, and work experience, would be able to perform jobs at a medium exertional level such as warehouse worker, floor waxer, and packager. (Tr. 59-60). The ALJ asked the VE to assume a further limitation of no fine visual acuity in the right eye and the VE testified that it would not affect the jobs he listed. (Tr. 60).

The ALJ then asked the VE to assume an individual with the above limitations who was also limited to lifting up to 20 pounds occasionally and lifting and carrying ten pounds frequently. *Id.* The VE testified that such an individual would be able to do light unskilled work such as machine tender and hand packager. (Tr. 60-61). Lastly, the ALJ asked the VE to consider an individual who fell asleep or blacked out at unpredictable times, two to four times a week. (Tr. 61). The VE testified that such a person would be precluded from work. *Id.*

17

## OPINION

Plaintiff assigns three errors in this case: (1) the ALJ improperly weighed the medical opinions and erroneously determined that plaintiff did not meet a Listing[6]; (2) the ALJ erred in determining plaintiff's credibility; and (3) the ALJ improperly relied on the VE's testimony. For the following reasons, the Court finds the ALJ's decision is supported by substantial evidence and should be affirmed.

## I.    The ALJ properly weighed the various medical opinions of record and his determination that plaintiff did not meet a Listing is supported by substantial evidence.

The ALJ determined plaintiff's severe mental impairments, considered singly and in combination, did not meet or equal the "paragraph B" criteria of Listings 12.02, 12.03, 12.04, or 12.08.[7] Plaintiff contends this determination is erroneous because the medical record establishes that plaintiff meets both "paragraph B" and "paragraph C" criteria for his mental impairments. Further, plaintiff asserts the ALJ did not accord proper weight to the opinions of plaintiff's treating physicians or his GAF scores. Plaintiff's arguments are not well-taken.

---

[6] Though plaintiff argues these points throughout his brief, for clarity's sake the Court will address them as one assignment of error.

[7] To meet the paragraph B criteria for Listings 12.02, 12.03, 12.04, and 12.08, two of the following must be present:

1. Marked restriction of daily activities; or
2. Marked difficulties in maintaining social functioning, or;
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.02(B), 12.03(B), 12.04(B), and 12.08(B).

The ALJ concluded that plaintiff had mild restrictions in activities of daily living, citing evidence that plaintiff walks, volunteers, and makes origami. Regarding social functioning, the ALJ found plaintiff moderately limited as he had a few friends, including friends who helped him with household chores and food shopping. The ALJ determined that plaintiff was moderately limited in his ability to maintain concentration, persistence and pace and had no episodes of decompensation. (Tr. 17).

Plaintiff contends that the record, specifically Dr. Leisgang's report, supports a finding that he meets the "paragraph B" criteria because her report "notes that [plaintiff] has had a marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, and pace." (Doc. 12, p. 9). While plaintiff quotes these "clinical findings" of Dr. Leisgang, he fails to provide a citation directing this Court to the specific records he is relying upon. Upon a review of the record, the only report from Dr. Leisgang is her May 2008 evaluation. (Tr. 317-22). In direct contradiction to plaintiff's contentions and in support of the ALJ's findings, Dr. Leisgang opined that plaintiff is moderately impaired in his ability to relate to others, mildly impaired in his ability to understand, remember, and follow simple instructions, and moderately impaired in his ability to maintain attention, concentration, persistence and pace. (Tr. 321-22).[8]

At no point did Dr. Leisgang opine that plaintiff had any marked limitations. In fact, Dr. Leisgang found plaintiff to be cooperative with appropriate affect, showing no signs of anxiety

---

[8] Curiously, plaintiff's Statement of Errors references Dr. Leisgang's findings of mild to moderate impairments but then asserts that Dr. Leisgang found "marked" limitations. *See* Doc. 12, p. 9.

or depression, though she did note that he exhibited symptomatology suggestive of Post-traumatic Stress Disorder and assigned him a GAF of 50.[9] (Tr. 319-21). The ALJ gave "great weight" to Dr. Leisgang's opinions, aside from the GAF score, and essentially adopted her "paragraph B" findings. (Tr. 21). Dr. Leisgang's opinion was considered by reviewing psychologist Dr. Casterline who also opined that plaintiff did not meet the "paragraph B" criteria. (Tr. 333). As there are no other medical opinions in the record regarding the "paragraph B" criteria, the ALJ's determination in this regard is substantially supported.

However, plaintiff contends that even if he does not meet the "paragraph B" criteria, he meets the "paragraph C" criteria and, thus, meets Listings 12.02, 12.03, and 12.04.[10] The only support plaintiff provides for this assertion is that "[c]learly, the 2006 and 2008 evaluation performed by Dr. Leisgang establishes the requisite disorder and requisite determination for the 'C' criteria." (Doc. 12, p. 6).

---

[9] Dr. Leisgang noted that plaintiff was not anxious or depressed but because he self-reported continual depression, worry, and suicidal ideation, she rated his GAF symptom severity as falling between 41 and 50. Further, Dr. Leisgang noted that she assigned a functional GAF of 41 to 50 based on plaintiff's self-reports but stated that "[b]ecause he appears to function in the upper end of this domain, a GAF of 50 will be assigned." (Tr. 321).

[10] To meet the paragraph C criteria for Listings 12.02, 12.03, and 12.04, there must be a "[m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or;
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.02(C), 12.03(C), and 12.04(C).

Dr. Leisgang examined plaintiff twice over the span of two years. These two evaluations are insufficient to establish the requisite "documented history of chronic organic mental disorder of at least 2 years' duration" for meeting "paragraph C" criteria. 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.02(C), 12.03(C), and 12.04(C). Moreover. Dr. Leisgang's report does not document any episodes of decompensation and, though she noted that stress may increase plaintiff's depressive symptomatology, she did not opine that marginal adjustments would cause him to decompensate. (Tr. 322).

Further, contrary to plaintiff's assertion, the record does not indicate that plaintiff has a history of being unable to function outside of a highly supportive living arrangement. Plaintiff reported and testified that he lived alone in an apartment (Tr. 34, 185) and there is no evidence that he requires a highly supportive living arrangement to function.[11] Moreover, Dr. Casterline opined that the evidence of record did not establish the presence of "paragraph C" criteria.[12] (Tr. 334). The ALJ reasonably relied on Dr. Casterline's opinion and the lack of evidence establishing "paragraph C" criteria and his determination that plaintiff does not meet or equal Listings 12.02, 12.03, 12.04, or 12.08 is substantially supported.

Plaintiff also asserts that the ALJ did not properly evaluate plaintiff's benign brain tumor under Listing 11.02, 11.03, and 11.04. (Doc. 12, p. 8). The ALJ determined that plaintiff's

---

[11] Plaintiff argues that his history of homelessness and incarceration indicates that he requires a highly supportive environment. (Doc. 12, p. 5-6). Not only is this argument speculative, the fact that plaintiff survived the homeless lifestyle and is now living in an apartment and volunteering could just as easily indicate that he does *not* require a highly supportive environment to be functional.

[12] Plaintiff erroneously states that Dr. Casterline did not consider plaintiff's personality disorder or brain tumor in forming her mental RFC. (Doc. 12, p. 6). However, her report includes a diagnosis that plaintiff suffers from a personality disorder and, further, states "[plaintiff] reports having a brain tumor and a stroke, but there is little evidence of either." (Tr. 330, 339).

syncope does not produce the signs and findings needed to meet the criteria of Listing 11.02 and 11.03 and that his stroke did not produce the signs and findings needed to meet the criteria of Listing 11.04.

Where a claimant has a benign brain tumor, the ALJ is to evaluate whether the claimant meets the criteria for Listings 11.02, 11.03, and 11.04. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.05. To meet the criteria for Listing 11.02, Epilepsy – convulsive epilepsy, plaintiff's condition must be "documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With: A. Daytime episodes (loss of consciousness and convulsive seizures) or B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02. Here, there is no "detailed description of a typical seizure pattern" and no evidence that plaintiff has experienced seizures more than once a month despite having three months of prescribed treatment. *Id.* In fact, the only evidence that plaintiff is treated for seizures is Dr. Rosenthal's one-page letter providing that plaintiff is prescribed Dilantin to prevent seizures. (Tr. 261). However, Dr. Rosenthal did not offer an opinion on the frequency of plaintiff's seizures despite treatment. Accordingly, the ALJ's determination that plaintiff did not meet the criteria for Listing 11.02 is substantially supported.

To meet the criteria for Listing 11.03, Epislepsy – nonconvulsive epilepsy, plaintiff's condition must be "documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months

22

prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.03. Again, due to the lack of evidence that plaintiff has had weekly episodes of documented seizures, the ALJ's determination that he did not meet Listing 11.03 is supported by substantial evidence.

To meet the criteria for Listing 11.04, Central Nervous System Vascular Accident, there must be evidence "of one of the following more than 3 months post-vascular accident: A. Sensory or motor aphasia resulting in ineffective speech or communication; or B. Significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.04. The record demonstrates that plaintiff likely experienced a vascular accident (stroke) within ten days prior to October 11, 2006. (Tr. 278-79). However, there is no evidence that plaintiff has had sensory or motor aphasia resulting in ineffective speech or communication. In fact, in August 2007, plaintiff's speech was noted as being spontaneous and fluent (Tr. 293) and in May 2008, Dr. Leisgang noted that plaintiff's conversation was not pressured or slow, that his thoughts were adequately organized and easily followed conversationally. (Tr. 319). Further, the transcript of plaintiff's testimony evinces his ability to effectively communicate. Accordingly, the record supports the ALJ's finding that plaintiff does not meet the "paragraph A" criteria of Listing 11.04.

Similarly, there is no evidence in the record that supports a finding that plaintiff meets the "paragraph B" criteria of Listing 11.04. Notably, plaintiff was treated at Mercy Hospital shortly

23

after his alleged stroke and did not mention this fact to his attending physicians.[13] Further, in

February 2007 plaintiff exhibited a full range of motion in his upper and lower extremities;

muscle strength of 5/5 bilaterally; 4/4 radial, pedal, and ulnar pulses bilaterally; and a normal

gait. (Tr. 294-95). In March 2008, plaintiff had a full range of motion, with pain (Tr. 303-04)

and in June 2008, plaintiff had a normal gait and neurological findings and was able to move all

extremities without difficulty. (Tr. 374). The physical RFC assessment, completed by reviewing

physician Dr. Cantor in July 2008, did not include any limitations with regards to plaintiff's

upper or lower extremities. (Tr. 342). In light of the above objective medical findings and the

dearth of evidence that plaintiff is significantly and persistently disorganized in the motor

function of two extremities, the ALJ reasonably determined that plaintiff did not meet the

"paragraph B" criteria of Listing 11.04. Consequently, the ALJ's finding that plaintiff was did

not meet Listing 11.04 is supported by substantial evidence.

Plaintiff's next argument is that the ALJ improperly discounted the opinion of Dr.

Rosenthal, a psychiatrist at Core Behavioral. The only evidence of record from Dr. Rosenthal is

a one-page, undated letter that provides:

[Plaintiff] has been under my care since 6/28/06. He has a history of
polysubstance abuse. He is on Fluoxetine 20 mg. daily. He has an intracranial
mass [right] and has been experiencing severe headaches and blackouts. He's on
Dilantin 100mg three times a day to prevent seizures. He is thereby incapable of
gainful employment for the foreseeable future.

---

[13] Plaintiff was treated on October 17 and 18, 2006 for pain and hiccups, respectively. (Tr. 263-64).

(Tr. 261).[14] Plaintiff asserts that, as a treating physician, Dr. Rosenthal's opinion should have been afforded significant weight and in discounting this opinion the ALJ did not comply with the requirements of §404.1527(d).

The Sixth Circuit has recently reaffirmed the long-standing principle that the "ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (quoting *Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(d)(2)). In accordance with this rule, the ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion, based on the evidence in the record, and the reasons must be sufficiently specific to enable meaningful review of the ALJ's decision. *Id.* at 406-07 (citing 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p, 1996 WL 374188, at *5; *Wilson*, 378 F.3d at 544).

Here, the ALJ gave "little weight" to Dr. Rosenthal's opinion due to a lack of supporting medical evidence and inconsistencies with the other evidence of record.[15] (Tr. 21). Upon review of Dr. Rosenthal's letter, the only opinion provided is that plaintiff is "incapable of gainful employment." (Tr. 261). Further, though the letter states that plaintiff has blackouts and an intracranial mass, it does not include or reference any objective clinical studies or findings. *See* 20 C.F.R. §§ 404.1508 (impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings, and not solely by claimant's statement of symptoms);

---

[14] Plaintiff mistakenly cites to page 308 of the transcript as the location of Dr. Rosenthal's opinion.
[15] The record reflects that attempts were made to get further records from Dr. Rosenthal but none were provided. (Tr. 339).

404.1528(a) (claimant's own description of impairment is not enough to establish existence of that impairment). *See also Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.") (internal citations and quotations omitted). It is unclear if Dr. Rosenthal was relying solely on plaintiff's subjective reports[16] of a brain tumor (as Dr. Tante-Takougang did, discussed *infra*) or if he was referring to objective medical evidence. Regardless, Dr. Rosenthal did not opine that the intracranial mass or blackouts limited plaintiff's ability to perform specific work-related activities except to say that he was incapable of employment.

Dr. Rosenthal's opinion was limited to his determination that plaintiff is "incapable of employment" and this opinion is not entitled to any deference. The ALJ is responsible for determining whether plaintiff meets the statutory definition of disability based on the medical and vocational evidence in the record. *See* 20 C.F.R. § 404.1527(e)(1). A treating physician's "broad conclusory formulations, regarding the ultimate issue which must be decided by the [Commissioner], are not determinative of whether or not an individual is under a disability." *Kirk*, 667 F.2d at 538. Here, because Dr. Rosenthal's letter was not supported by any clinical or diagnostic evidence and was inconsistent with other substantial evidence of record, and because the only medical opinion he provided regarded the ultimate issue of disability, the ALJ put forth "good reasons" for rejecting Dr. Rosenthal's opinion. *Blakley*, 581 F.3d at 406-07. Given the

---

[16] "Subjective complaints of 'pain or other symptoms shall not alone be conclusive evidence of disability.'" *Buxton*, 246 F.3d at 773 (quoting 42 U.S.C. § 423(d)(5)(A)).

lack of evidence in the record, the ALJ appropriately considered the factors set forth in §

404.1527(d), such as the letter's consistency with the other record evidence and its

supportability, and his determination to give "little weight" to Dr. Rosenthal's conclusory letter

is substantially supported.

Lastly, plaintiff argues that the ALJ failed to accord significant weight to plaintiff's GAF

scores. In January 2006, plaintiff was assigned a GAF score of 55 at his evaluation at Center

Point (Tr. 387); in May 2008, Dr. Leisgang assigned a GAF score of 50 (Tr. 321); and in May

2008, at an evaluation at Center Point, plaintiff was assigned a GAF score of 50. (Tr. 385). The

ALJ considered these scores and noted that they are not determinative. (Tr. 21).

As the Sixth Circuit instructs:

A GAF score is a subjective determination which represents "the clinician's
judgment of the individual's overall level of functioning." American Psychiatric
Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM- IV), (4th
ed. 1994), p. 30. The GAF score is taken from the GAF scale which "is to be rated
with respect only to psychological, social, and occupational functioning." *Id.* The
GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of
severely hurting self or others or persistent inability to maintain minimal personal
hygiene or serious suicidal act with clear expectation of death).

*Rutter v. Comm'r of Soc. Sec.,* No. 95-1581, 1996 WL 397424, at *1 (6th Cir. July 15, 1996).

The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms and

individuals with scores of 51 to 60 as having "moderate symptoms." *See* DSM-IV at 32.

Though a GAF score of 50 is low, indicating that plaintiff had serious symptoms, these

are not determinative in finding that an individual is disabled. *DeBoard v. Comm'r of Soc. Sec.,*

211 F. App'x 411, 415 (6th Cir. 2006). Further, the Sixth Circuit has repeatedly stated that GAF

27

scores are not medical data; rather they are subjective determinations, and ALJs are not required to rely on them in making disability determinations. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). *See also Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *Kornecky v. Comm'r of Soc. Sec.*, No 04-2171, 2006 WL 305648, at *13-14 (6th Cir. Feb. 9, 2006); *Wesley v. Comm'r of Soc. Sec.*, No. 99-1226, 2000 WL 191664, at *3 (6th Cir. Feb. 11, 2000).

Here, the ALJ acknowledged and discounted these GAF scores in turn. The ALJ discounted the scores assigned by Center Point because they were partially based on plaintiff's substance abuse and, further, the ALJ noted that the score was assigned by a nurse and social worker – neither of which are acceptable medical sources. *See* 20 C.F.R. § 404.1513(d). The ALJ similarly discounted the score assigned by Dr. Leisgang as based on plaintiff's substance abuse, but also noted that the low score suggested functional limitations that were otherwise unsupported by the record.[17] It is well within the discretion of the ALJ to discount these scores after weighing the evidence of record. *See Davis v. Chater*, No. 95-2235, 1996 WL 732298, at *2 (6th Cir. Dec. 19, 1996) (upholding ALJ's determination to discount GAF score of 35).

The ALJ properly weighed the medical opinions of record and the evidence of record substantially supports his findings. Further, the ALJ's determination that plaintiff's severe impairments did not meet or equal a Listing is supported by substantial evidence and should be affirmed.

---

[17] Dr. Leisgang's low score of 50 appears largely based on plaintiff's self reports of depression, as she noted that plaintiff did not appear anxious or depressed and appeared to be functioning relatively well. (Tr. 321).

## II. The ALJ's credibility determination is supported by substantial evidence.

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton*, 246 F.3d at 773; *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)). In determining credibility, the ALJ may consider the claimant's testimony of limitations in light of other evidence of the claimant's ability to perform other tasks such as walking, going to church, going on vacation, cooking, vacuuming and making beds. *Heston v. Comm'r*, 245 F.3d 528, 536 (6th Cir. 2001).

The ALJ's credibility decision must also include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than

treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96-7p.

In discrediting the instant plaintiff's allegations of his limitations, the ALJ noted multiple inconsistencies between plaintiff's testimony and other evidence of record which undermined his credibility. Specifically, the ALJ identified the following discrepancies: plaintiff testified that he had poor vision, glaucoma, and difficulty reading (Tr. 35, 46, 55) but medical records note that plaintiff is able to read fine print (Tr. 295) and demonstrate that he has 20/20 visual acuity in his left eye and 20/25 visual acuity in his right eye (Tr. 354); plaintiff testified that he did not watch television (Tr. 53) but reported to Dr. Leisgang that he watched television daily[18] (Tr. 319); plaintiff testified that he rode his bike frequently until he broke his leg while bicycling in 2007 (Tr. 43) but medical records indicate that his leg was broken due to a fall down stairs (Tr. 366); and plaintiff testified that, since 2004, he has not been able to lift anything heavier than a two-liter bottle of soda (Tr. 44), but in his prior 2005 hearing testimony he stated was able to lift 50 pounds (Tr. 73) and in his April 2008 Function Report he reported he could lift 30 to 70 pounds. (Tr. 190).

The ALJ further identified plaintiff's inconsistent reports regarding his drug and alcohol abuse. *Compare* (Tr. 55) (plaintiff testified in 2010 that he had not used alcohol or illicit drugs since 1999) *with* (Tr. 320) (plaintiff reported to Dr. Leisgang in May 2008 that he had been sober

---

[18] Also, plaintiff reported watching television daily in two separate Function Reports. (Tr. 186, 236).

for the past 19 months); (Tr. 272) (July 2006 medical records where plaintiff reported occasional alcohol use); *and* (Tr. 303) (March 2008 medical records where plaintiff reported occasional use of alcohol and marijuana). The ALJ also noted that Dr. Leisgang reported that plaintiff's 2008 statements were inconsistent with his prior 2006 statements, and that the records from Dr. Wunder and Center Point revealed inconsistencies in plaintiff's reports to these providers. Further, upon a review of the record, even more inconsistencies can be found in plaintiff's statements both to the ALJ and to his medical and social work providers. For example, plaintiff testified that he did not see his family (Tr. 49-50), yet his social worker noted that his communication with his family and friends was an interpersonal strength. (Tr. 382). Also, plaintiff reported in a Function Report that he did not drive because he could not pass the vision test (Tr. 235) but he testified at the hearing that he had never had a driver's license and did not drive because of an incident with police officers. (Tr. 35).

Plaintiff argues that the ALJ did not take his mental impairments into account when determining his credibility which would excuse his "bizarre, grandiose statements." (Doc. 12, p. 10). This argument is not well-taken.[19] Plaintiff's assertion that these inconsistencies are a product of his mental impairment is unsupported. There is no medical opinion in the record that plaintiff's mental impairment causes him to make inconsistent statements. Moreover, upon review of the statements the ALJ identified, none of these are "bizarre" or "grandiose;" rather,

---

[19] Notably, plaintiff provides no legal authority supporting his argument that statements made by an individual with delusional tendencies should be given credence. Indeed, it would be a dubious practice to find credible testimony made by an individual with a mental impairment that causes them to make unrealistic statements.

the inconsistencies generally appear to be contradictions, potentially deceptions, regarding plaintiff's substance abuse and physical capabilities.

Further, plaintiff has not identified any specific objective medical evidence that supports his subjective complaints of physical and mental limitations. Plaintiff argues the ALJ erred by not considering plaintiff's statements regarding his limitations - that he has a brain tumor which causes him to blackout and experience daily painful headaches and, consequently, he is precluded from working. While the MRI findings indicate that plaintiff has some scar tissue in his frontal lobe (Tr. 278), there is no medical opinion in the record to support the conclusion that it causes his alleged syncopal episodes or otherwise limits plaintiff's capabilities in any fashion. Plaintiff points to his own subjective reports to his medical providers in support of his contention that a brain tumor is causing him disabling pain and blackouts.[20] (Doc. 12, p. 7, 10) Such subjective evidence does not satisfy the *Duncan* test and cannot alone support a finding of disability. *Duncan*, 801 F.2d at 852-53; 20 C.F.R. § 404.1529. *See also McCormick v. Secretary*, 861 F.2d 998, 1001 (6th Cir. 1988).

The ALJ provided explicit reasons for finding that plaintiff's statements regarding his limitations were not credible and the medical evidence of record does not support plaintiff's allegations. Further, in making the credibility determination, the ALJ appropriately considered plaintiff's daily activities (walking, origami, volunteering), the duration and frequency of his symptoms and medications taken (daily pain in back, leg and head which is treated with

---

[20] Plaintiff specifically notes that the objective evidence supports his testimony that his syncopal episodes caused him to fall off his bike and down some stairs. (Doc. 19, p. 4). However, the objective evidence contradicts this assertion. *See* (Tr. 297) (plaintiff reported he fell of the bike because it was dark and he had a bad eye); (Tr. 366) (plaintiff reported that he fell down stairs and twisted ankle but did not report any blackout).

medication), and any other treatment that plaintiff employs (plaintiff underwent surgery for trauma to his right eye) as required by 20 C.F.R. §§ 404.1529(c) and 416.929(c) and SSR 96-7p. (Tr. 17, 19-20). In light of the evidence of record, the ALJ's credibility determination is supported by substantial evidence and should be affirmed.

## III. The ALJ's vocational findings are supported by substantial evidence.

In his final assignment of error, plaintiff asserts that the ALJ's vocational findings were erroneous because the ALJ did not incorporate plaintiff's alleged blackouts in his hypothetical question to the VE and, also, because the VE should not have used the grid[21] to render his opinion due to plaintiff having both exertional and nonexertional limitations. Plaintiff is mistaken on both counts.

Plaintiff contends that the ALJ erred by not questioning the VE at the administrative hearing with respect to plaintiff's ability to work given his alleged blackouts. (Doc. 12, p.11). This completely misstates the record. At the hearing, the ALJ questioned the VE regarding a variety of potential mental and physical limitations and in concluding the examination the following exchange occurred:

ALJ: And if a person - - an individual either fell asleep or had blacked out at unpredictable times say two to four times a week. Would that have any effect on employability?

VE: If that was done beyond the normal break times or cause a disruption or cause a person to miss work, yes, it would. A person would not be able to maintain employment, I don't believe.

---

[21] The Medical Vocational Guidelines (the "grid"), 20 C.F.R. § 1501 *et seq*., were designed to provide "an orderly sequence of adjudication for social security claims" and may an inform an ALJ's determination as to whether an individual with specific limitations is disabled. *Kirk*, 667 F.2d at 527.

(Tr. 61). Clearly, despite plaintiff's assertion, the ALJ addressed the issue of plaintiff's alleged blackouts at the administrative hearing and elicited testimony from the VE regarding the effect of plaintiff's allegations on his employability. Nevertheless, the ALJ determined that the frequency of the blackouts to which plaintiff testified should not be credited and should not be included in the RFC assessment and vocational hypothetical ultimately relied on in finding plaintiff not disabled. The ALJ did not err in this regard as "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Sec'y of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994). *See also Casey v. Sec'y of H.H.S.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (ALJ required to incorporate only those limitations accepted as credible in hypothetical to VE).

Here, the hypothetical questions posed to the VE accurately portrayed plaintiff's abilities and limitations. *See Varley*, 820 F.2d at 779. Consequently, the ALJ's reliance on the VE's testimony, that there was work available in the national economy which plaintiff could do, is supported by substantial evidence.

Plaintiff's second contention is equally flawed. Plaintiff, relying on *Cole v. Sec'y of H.H.S.*, 820 F.2d 768 (6th Cir. 1987), asserts that the ALJ erred by relying on the VE's testimony in finding that plaintiff was capable of performing certain jobs because "the [VE's] opinion [was] based solely on the grids." (Doc. 12, p.12). While plaintiff correctly notes that he has exertional and nonexertional limitations, which requires the

ALJ to rely on more than just the grid in making his RFC determination, *Cole*, 820 F.2d at 772, plaintiff's argument is otherwise misplaced.

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id.*, § 200.00(e)(1). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id.*, § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Sec'y of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk*, 667 F.2d at 528-29.

In light of the above, plaintiff's contention that the ALJ is wholly precluded from referring to the grids by virtue of his nonexertional limitations is without merit. Moreover, in this case, the ALJ did not rely solely on the grids in determining whether work existed for an individual with plaintiff's RFC. The ALJ properly used the grid as a

35

framework but also relied on the VE's testimony due to plaintiff's nonexertional limitations. (Tr. 22). The VE did not make any reference to the grid; rather, the VE relied on the Dictionary of Occupational Titles ("DOT") in identifying potential medium and light level work that plaintiff is capable of performing given his RFC.[22] The ALJ is permitted to take notice of the DOT, 20 C.F.R. § 404.1566, and may rely on the testimony of a VE to determine complex issues concerning specific occupations. 20 C.F.R. § 404.1566(e). Here, as the ALJ reasonably relied on the VE's testimony, which reasonably referenced the DOT, the ALJ's determination that plaintiff is capable of performing specific jobs is supported by substantial evidence and should be affirmed.[23]

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: __11/16/2011__

_Karen L. Litkovitz_
Karen L. Litkovitz
United States Magistrate Judge

---

[22] It appears that plaintiff has conflated the DOT with the grid. However, these are distinct reference materials and restrictions related to the ALJ's reliance on the grid do not equate to a VE being unable to rely on the DOT. The grid became effective in 1979 and was published by the Social Security Administration pursuant to a Congressional request to provide clear standards for disability determinations. _Kirk_, 667 F.2d at 527-28. The DOT is supplied by the U.S. Department of Labor and is designed to match job seekers to jobs. _See Oriental Rug Imps., Ltd. v. Employment and Training Admin._, 696 F.2d 47, 48 (6th Cir. 1982).

[23] In his reply brief, plaintiff also attacks the VE's testimony that a person with plaintiff's RFC as determined by the ALJ could perform work as a warehouse worker, floor waxer, and packager, as these jobs would expose plaintiff to fumes, require him to perform tandem tasks, and involve fast paced production, all of which were accounted for in the RFC. (Doc. 19, p. 6-7). "Issues raised for the first time in a reply brief are not properly before this [C]ourt." _U.S. v. Perkins_, 994 F.2d 1184, 1191 (6th Cir. 1993). Moreover, this new argument is unsupported and speculative.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

FAZL MUGHNI,

    Plaintiff

    vs

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

    Defendant.

Case No. 1:11-cv-18

Spiegel, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

37